UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:20-CV-00216-CRS-CHL

NORA HARRIS,                                                            Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,                                     Defendant.

## REPORT AND RECOMMENDATION

Before the Court is the Complaint filed by Plaintiff, Nora Harris ("Harris"). Harris seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). (DN 1.) This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation. (DN 16.) Harris filed a Fact and Law Summary on October 29, 2020, and the Commissioner filed a Fact and Law Summary in response on January 29, 2021. (DNs 17, 22.) Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

## I.    FINDINGS OF FACT

On or about June 22, 2017, Harris filed an application for supplemental security income ("SSI") alleging disability beginning on January 1, 2012.[1] (R. at 15, 17, 26.) On September 9, 2019, Administrative Law Judge ("ALJ") Steven Collins conducted a hearing on Harris's application.[2] (*Id.* at 50-100.) In a decision dated November 27, 2019, the ALJ engaged in the five-

---

[1] While the copy of Harris's application in the record is dated October 22, 2017, other documents in the record reference a June 22, 2017, filing date. (R. at 15, 17, 26, 132, 148, 287-92.) The ALJ and Harris's counsel also discussed a June 22, 2017, filing date during the hearing. (*Id.* at 99.) Given these references, the undersigned finds that Harris's application was filed on June 22, 2017.
[2] The ALJ first attempted to conduct the hearing on March 25, 2019, but the hearing was continued to allow Harris to obtain a new representative to assist her during the hearing. (*Id.* at 33-49.)

step sequential evaluation process promulgated by the Commissioner. (*Id.* at 12-32.) In completing this evaluation, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since June 22, 2017, the application date. (*Id.* at 17.)

2.   The claimant has the following severe impairments: syncope; arthralgia; degenerative disc disease; obesity; cubital tunnel syndrome; asthma; bipolar schizoaffective disorder; generalized anxiety disorder; major depressive disorder; and attention deficit hyperactivity disorder (*Id.*)

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

4.   [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except no climbing of ladders, ropes or scaffolds. The claimant should have no exposure to hazards. She should avoid concentrated exposure to pulmonary irritants (fumes, odors, dust, gas and poor ventilation). She could frequently perform handling and fingering. The claimant is capable of simple, routine repetitive (minimal variation in job duties day to day) tasks. She is capable of simple work related decisions. There should be few, if any, work place changes. The work should have no fast-paced production requirements. She can perform these type of tasks over two hour segments in an eight-hour work day. She could have occasional contact with supervisors and workers, but no contact with the public. (*Id.* at 19-20.)

5.   The claimant has no past relevant work. (*Id.* at 25.)

6.   The claimant was born on December 19, 1972 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (*Id.*)

7.   The claimant has at least a high school education and is able to communicate in English. (*Id.*)

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work. (*Id.*)

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (*Id.*)

      10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 22, 2017, the date the application was filed. (*Id.* at 26.)

Harris subsequently requested an appeal to the Appeals Council, which denied her request for review on February 3, 2020. (*Id.* 1-6, 278-83.) At that point, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 422.210(a) (2020); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision). Pursuant to 20 C.F.R. § 422.210(c), Harris is presumed to have received that decision five days later. 20 C.F.R. § 422.210(c). Harris timely filed this action on March 27, 2020. (DN 1.).

## II.    CONCLUSIONS OF LAW

The Social Security Act authorizes payments of SSI to persons with disabilities. *See* 42 U.S.C. §§ 1381-1383f. An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a) (2020).

### A.    Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have

supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.     Five-Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim. 20 C.F.R. § 416.920 (2020). In summary, the evaluation process proceeds as follows:

(1)     Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2)     Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[3] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3)     Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4)     Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5)     Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

---

[3] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 416.909 (2020).

20 C.F.R. § 416.920(a)(4).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.    Harris's Contentions

Harris contested the ALJ's Finding Nos. 4, 9, and 10. (DN 17, at PageID # 1829, 1838-39.) She argued that the ALJ improperly assessed her use of a cane, cubital tunnel syndrome, syncope, and mental impairments; the ALJ failed to consider her impairments in combination; the ALJ improperly assessed her pain; the ALJ erred in his evaluation of the opinion evidence in the record; the jobs the ALJ found she could perform at step five were inconsistent with his determination of her RFC; and the jobs the ALJ found she could perform at step five were inconsistent with her cubital tunnel syndrome and syncope. (*Id.* at 1829-40.) The undersigned will address Harris's arguments below.

### 1.    RFC

Harris made a number of arguments related to the ALJ's determination of her RFC in Finding No. 4. An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations. 20 C.F.R. §§ 416.945(a), 416.946(c) (2020). The ALJ bases his or her determination on all relevant evidence in the case record, including statements from medical sources. 20 C.F.R. § 416.929 (2020); 20 C.F.R. §§ 416.945(a)(1)-(3), 416.946(c). Thus, in making his or her determination of a claimant's RFC, an

ALJ must necessarily evaluate the persuasiveness of the medical sources statements in the record and assess the claimant's subjective allegations.   20 C.F.R. § 416.920c (2020); 20 C.F.R. § 416.929(a).

Here, as to her physical RFC, the ALJ found that Harris could perform light work except she could not climb ladders, ropes, or scaffolds; should have no exposure to hazards; avoid concentrated exposure to pulmonary irritants; and could frequently perform handling and fingering.  (R. at 19-20.)  As to her mental RFC, the ALJ found that Harris was capable of simple, routine repetitive tasks with minimal variation in job duties from day to day; could make simple, work-related decisions; should be subject to few, if any, workplace changes; should not have fast-paced production requirements; could have occasional contact with supervisors and workers but no contact with the general public; and could perform tasks consistent with those limitations over two-hour segments in an eight-hour work day.  (*Id.* at 20.)  Generally, the ALJ relied on Harris's hearing testimony, condition during the hearing, daily activities, the medical evidence of record from her treatment providers, multiple consultative examinations in the record, and the opinions of the state agency physicians in reaching his determination.  (*Id.* at 19-25.)  The undersigned will more specifically address the individual limitations the ALJ found in his determination of Harris's RFC and the evidence he relied on to support each in tandem with Harris's specific objections below.

### a)      Use of a Cane

Harris argued that the ALJ's RFC finding improperly considered her use of a cane.  (DN 17, at PageID # 1831, 1839.)  In particular, Harris emphasized that the ALJ cited parsed facts in support of his conclusion and failed to acknowledge that her treating doctor prescribed the cane.  (*Id.* at 1831.)  Harris also argued that even occasional use of the cane would be inconsistent with

the ability "to be on her feet doing light work in the ordinary workplace consistently for 6 of 8 hours a day 5 days er [*sic*] week." (*Id.*)

The ALJ's RFC found that Harris could perform light work as defined in 20 C.F.R. § 416.967(b) except that she could not climb ladders, ropes, or scaffolds. (R. at 19-20.) Light work involves "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls," and to be capable of light work, a person must "have the ability to do substantially all of th[o]se activities." 20 C.F.R. § 416.967(b) (2020). In making his determination, the ALJ observed that Harris ambulated with a cane during her hearing. (R. at 20.) He also explained that, based on his review of the medical records, Harris "apparently began using a cane for [*sic*] recently; however, it appears to be used only for balance and because she complained of her leg 'going out.' " (*Id.* at 21.) He noted that she did not demonstrate antalgic gait and that there was "some suggestion" in the medical records that Harris did "not require the cane consistently." (*Id.*) The ALJ cited that while Harris presented with a cane during a May 19, 2016, mental consultative examination with Gary Bachara, Ph.D., ("Bachara") in May 2016, she did not present with one a month later at her physical consultative examination with Joseph J. Umesi, M.D. (*Id.* at 23, 632, 635-39.) He also emphasized that an x-ray of Harris's "lumbar spine showed only minimal to mild spondylosis at the L4-5 and L5-S1 levels" and x-rays of her right and left hip were negative. (*Id.* at 21.) He noted that Harris was referred to physical therapy. (*Id.*) The ALJ concluded that he did not find Harris's allegations of a need for a cane to be persuasive. (*Id.*) He did not include any limitations related to use of a cane or her ability to stand or walk in his determination of Harris's RFC.

Though Harris criticized the ALJ for parsing facts in the medical records, the records appear consistent with the ALJ's characterization and summary of them. Harris frequently

presented with normal gait and stance between May 23, 2017, and January 4, 2019.  (*Id.* at 670 (5/23/2017), 678 (6/20/2017), 682 (6/26/2017), 687/836 (7/17/2017), 745 (8/21/2017), 762 (9/14/2017), 756/819 (10/24/2017), 1157 (3/9/2018), 1143 (12/4/2018), 1129 (1/4/2019).)  Then, during a March 22, 2019, visit at Family Health Centers with Teresa Casey, APRN, ("Casey"), Harris reported weakness in her legs and her legs giving out randomly.  (*Id.* at 1116.)  She indicated that she wanted to know why and requested a cane to keep her from falling.  (*Id.*)  The record from this visit reflects an instruction to "[p]lease obtain cane for pt" and states, "[G]iven a cane to assist ambulation."  (*Id.* at 1113, 1116.)  Casey's notes indicated that Harris's gait that day was abnormal and that Harris had some difficulty getting on and off the exam table and beginning ambulation as well as that Harris reported her leg "going out" while walking down the hallway.  (*Id.* at 1116.)  Casey directed Harris to obtain an x-ray of her lumbar spine and return for re-evaluation.  (*Id.* at 1113.)  Harris had a spinal x-ray on March 27, 2019, that showed minimal to mild spondylosis at the L4-L5 and L5-S1 levels and no suspected acute lumbar spine findings.  (*Id.* at 1362-63.)  During her subsequent April 5, 2019, visit at Family Health Centers, Harris reported to Casey that her left leg continued to give way randomly but that the cane had been helpful.  (*Id.* at 1111.)  Casey again documented abnormal gait and noted that Harris was using a cane for ambulation; however, she also noted that Harris "seem[ed] to have no difficulty accessing the exam table, [and] [wa]s slgihtly [*sic*] unstalbe [*sic*] when getting down from table."  (*Id.* at 1112.)  Casey directed Harris to obtain x-rays of her right and left hips.  (*Id.* at 1108.)  Harris obtained the x-rays the same day, which found no bone or joint abnormality and no fracture in either hip.  (*Id.* at 1402-04.)  Harris visited with Mary L. Hill, APRN, ("Hill") on April 26, 2019, and Hill noted that Harris was using a cane for support and documented unspecified "[m]usculoskeletal symptoms."  (*Id.* at 1102, 1104.)  At her July 5, 2019, visit with Casey, Casey noted that Harris's x-rays were negative and

referred her to physical therapy for her leg and hip pain and difficulty walking.  (*Id.* at 1093.)
Casey's notes stated, "I do not know why your legs hurt because the x-rays are negative."  (*Id.*)
When Casey reviewed the x-ray results with Harris, Harris indicated that she felt the x-rays "cannot
be correct because she has pain," and Harris continued to report leg pain and her legs giving out
when walking.  (*Id.* at 1095-96.)  Casey documented normal gait and noted that despite using a
cane for ambulation, Harris was able to get on and off the exam table without assistance, her gait
was not antalgic, and she had no other gait disturbance during her visit.  (*Id.* at 1096.)  At a
subsequent August 20, 2019, visit with Hill shortly before the hearing with the ALJ, Hill
documented that Harris reported getting some benefit from physical therapy, that her "muscles are
relaxing and not as tense," and "[l]ess pain, more movement."  (*Id.* at 1083.)  Hill documented no
musculoskeletal symptoms.  (*Id.* at 1084.)

Though Harris argued the ALJ ignored the "prescribed cane" and that the "treating doctor
found abnormal gait and determined she needed a cane," the undersigned finds this to be an
incorrect summation of the records.  (DN 17, at PageID # 1831.)  Harris's treating nurse
practitioner, Casey, provided Harris a cane at Harris's request and subsequent records noted that
Harris used it, not that one was prescribed or needed.  Harris pointed to no other records supporting
that a medical provider indicated that Harris required the use of a cane to ambulate or that any
provider assessed functional limitations related to use of a cane, walking, or sitting.  The records
also demonstrate negative x-rays and that at numerous visits, including one shortly before Harris's
hearing with the ALJ, Harris demonstrated normal gait.  Given these records, the undersigned finds
that the ALJ's analysis of Harris's use of a cane and his omission of any functional limitations
related to the same from his RFC finding is supported by substantial evidence.

b)      **Cubital Tunnel Syndrome**

Harris argued that the ALJ improperly rejected any functional limitations related to her cubital tunnel syndrome without any narrative discussion as to why she is capable of frequent use of her hands and fingers.  (DN 17, at PageID # 1836.)  She emphasized that there was no evidence to support that her use of splints and towels cured her condition and that the ALJ improperly inferred that "little treatment for cubital tunnel allows using one's upper extremities."  (*Id.* at 1837, 1839.)  She also argued that the ALJ improperly assessed her cubital tunnel on the sole basis of the medical findings and did not mention her activities of daily living or the fact that she reported needing help from her children.  (*Id.* at 1835.)

Though the ALJ found Harris's cubital tunnel syndrome to be a severe impairment at step two, in his RFC, he found that Harris was capable of frequently performing handling and fingering.  (R. at 17, 20.)  The ALJ observed that Harris presented at the hearing with a brace on her right arm.  (*Id.* at 20.)  He noted that Harris testified that she wears a brace on her left wrist, has a brace for her right wrist, and wears the braces at night.  (*Id.* at 21.)  He found that the objective medical evidence demonstrated she complained of hand pain.  (*Id.*)  He noted that Harris's EMG showed evidence for ulnar neuropathies at the elbows bilaterally and a mild pinched nerve near the elbow.  (*Id.*)  However, he noted that there was no evidence of carpal tunnel syndrome on either side and no myotonic discharge.  (*Id.*)  He recounted that she was told to avoid bending her arms at night near the elbow given the pinched nerve and that she should wrap her elbow in a towel at night to prevent against compression.  (*Id.*)  She was also given splints.  (*Id.*)  The ALJ rejected the opinion of a physical consultative examiner ("CE") that found no physical functional limitations except for possible neuropathy in part because given her cubital tunnel diagnosis, Harris needed some manipulative limitations.  (*Id.* at 22.)  He likewise rejected the opinion of the state agency

physicians that her physical impairments were not severe and that she could perform medium work given, in part, the evidence related to her cubital tunnel syndrome.  (*Id.* at 25.)  However, the ALJ also emphasized that despite the evidence supporting the existence of her cubital tunnel syndrome, Harris has had very little treatment for the impairment.  (*Id.* at 24.)

The undersigned finds that the ALJ properly included a narrative discussion of his findings regarding Harris's cubital tunnel syndrome.  SSR 96-8p states that an ALJ's assessment of a claimant's RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p,  61 Fed. Reg. 34,474, 34,478 (July 2, 1996).  It requires an ALJ's RFC finding to address in a function-by-function evaluation both the exertional and nonexertional capabilities of an individual.  *Id.* at 34,477.  Exertional limitations relate to an individual's ability to sit, stand, walk, lift, carry, push, and pull.  *Id.*  Nonexertional limitations relate to an individual's potential postural, manipulative, visual, communicative, and mental limitations and ability to tolerate various environmental factors.  *Id.*  However, "case law does not require the ALJ to discuss those capacities for which no limitation is alleged."  *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002).  Here, the ALJ's discussion included specific findings that Harris had nonexertional limitations related to her cubital tunnel syndrome with citations to medical evidence related to the same.  The ALJ also noted that she had very little treatment for the impairment; it is not improper for an ALJ to consider the type of treatment sought by a claimant in evaluating a complaint of disabling pain and symptoms.  *See* 20 C.F.R. § 416.929(c)(3)(iv)-(vi) ("Factors relevant to your symptoms, such as pain, which we will consider include: . . . (iv) (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you

receive or have received for relief of your pain or other symptoms; [and] (vi) Any measures you use or have used to relieve your pain or other symptoms . . . ."); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Harris provided no support that more discussion is required by SSR 96-8p than that provided by the ALJ; instead, she seems to simply dispute his conclusion.

As to her argument that the ALJ failed to consider her daily activities and that she needed help from her children, a review of his decision reveals otherwise. The ALJ explicitly noted her testimony that her husband and daughter check on her and that although she can prepare simple meals and use a crockpot, her younger children help her clean the house and wash dishes. (R. at 20.) While her daily activities are one of the factors the ALJ is required to consider in assessing the intensity and persistence of her symptoms in assessing a claimant's RFC, Harris provided no authority to support that her daily activities should outweigh the medical evidence cited above. 20 C.F.R. § 416.929(c)(3)(i); 20 C.F.R. § 416.945(e) ("In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence, including the information described in § 416.929(c)."). Accordingly, Harris's argument on this basis is without merit.

Harris's argument that the ALJ failed to recognize that her use of splints and towels at night did not cure her condition and did not preclude her having pain during the day mischaracterizes the ALJ's decision. The ALJ never concluded that Harris's cubital tunnel syndrome was cured or even that she had no functional impairments related to the same. Instead, he found that her impairment was accommodated by no more than frequent handling and fingering. While Harris

disputes the ALJ's findings related to her cubital tunnel syndrome, hand pain, and numbness, the records she cited in support of her arguments are consistent with the ALJ's analysis of her impairment.  (R. at 745, 759, 762, 1309-11, 1314, 1155.)  Pivotally, Harris does not cite to any evidence that any treatment provider ever put any limitations on her ability to perform work tasks or daytime activities due to her cubital tunnel syndrome.

Based on the foregoing, the undersigned finds that the ALJ's assessment of Harris's cubital tunnel syndrome was supported by substantial evidence.

c)     **Syncope**

Harris argued that the ALJ provided no explanation for how her syncope would not result in additional functional limitations to those espoused in his RFC determination.[4]  (DN 17, at PageID # 1831-32.)  The Commissioner emphasized in her Fact and Law Summary that Harris's argument misunderstands the burden facing Harris.  (DN 22, at PageID # 1861.)  As the Commissioner correctly notes, up until step five, the burden is on Harris to prove that she is disabled, including in establishing her residual functional capacity.  *Her*, 203 F.3d at 391-92.  However, this does not remove the requirement that the ALJ's RFC determination—including his conclusion regarding what limitations are imposed by Harris's syncope—be supported by substantial evidence.

The ALJ found that Harris should have no exposure to hazards in his RFC determination.  (R. at 20.)  In support, he noted her testimony that she has jerking episodes once or twice a week.  (*Id.* at 21.)  He found that the record did support that she had episodes of syncope; however, he

---

[4] Harris also argued the ALJ improperly distinguished between her "jerking" episodes and her syncope in his assessment of her RFC.  (DN 17, at PageID # 1832.)  The ALJ's decision referenced both "jerking" episodes and syncope, though during the hearing, Harris and her attorney discussed the two as if they were one in the same.  (R. at 57, 80-82.)  Harris pointed to no specific examples of how the ALJ separated the two save for general citations to pages of the ALJ's decision, and no instance of the same is apparent to the undersigned on those pages.  Thus, the undersigned finds Harris's contention to be without merit.

emphasized that her workup was generally unremarkable.  (*Id.*)  Her EEG was normal, an MRI of her brain showed minimal changes of ischemic white matter disease, and there was not evidence of acute intercranial abnormality or pathological enhancement.  (*Id.*)  He noted that her cardiologist opined her syncope was orthostatic and that that her medications were likely contributing factors. (*Id.* at 21-22.)  He also summarized that in early 2019, she was advised that her episodes of syncope were likely related to polypharmacy or pseudoseizures and referred to psychiatry; however, she had no further documented treatment for the condition.  (*Id.* at 22.)  As noted above, an ALJ is permitted to consider a claimant's treatment or lack thereof in assessing complaints of disabling pain or symptoms.  *See* 20 C.F.R § 416.929(c)(3)(iv)-(vi); *Strong*, 88 F. App'x at 846.  In rejecting the opinion of the physical CE, the ALJ also noted that Harris would need postural and environmental limitations to avoid "putting her at risk due to seizures."  (*Id.*)

As with her arguments related to her cubital tunnel syndrome, Harris provided no citation to any record supporting that a treatment provider assessed any limitations on her ability to perform basic work activities as a result of her syncope, including any limitations beyond those already imposed by the ALJ.  Without such evidence, the undersigned finds that the ALJ's assessment of her syncope and RFC determination related to the same are supported by substantial evidence.

### d)     Opinion Evidence

Harris criticized the ALJ's discussion of the June 25, 2016, report from CE Bachara and the September 15, 2017, CE report from Daniel Miller, Ph.D., ("Miller").[5]  (DN 17, at PageID #

---

[5] There was also a February 29, 2012, consultative examination with Ashly T. Weeks, M.A., in the record that the ALJ considered in his decision.  (R. at 411-15.)  The only reference Harris makes to this evaluation in her Fact and Law Summary is to note that the report found that she had occupational problems that were consistent with her testimony and the record.  (DN 17, at PageID # 1838.)  The ALJ found the 2012 evaluation was not persuasive because it was "vague as to actual limits" and remote to the period at issue.  (R. at 23.)  Because Harris does not provide any specific argument as to why this conclusion was unsupported by substantial evidence or in violation of the applicable regulations other than to summarize the report, the undersigned finds she has waived any such argument.  *See United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.

1837-38.)  Specifically, she argued that the ALJ's discussion did not cite specific examples in the reports to support his conclusions.  (*Id.*)  The new regulations for evaluating medical opinions are applicable to Harris's case because she filed her application after March 27, 2017.  Pursuant to 20 C.F.R. § 416.920c, an ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[6]  20 C.F.R. § 416.920c(a).  Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 416.920c(a), (c).  The regulation provides that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . ."  20 C.F.R. § 416.920c(a), (b)(2).  However, the regulation states that "it is not administratively feasible for [an ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions . . . in [the] case record"; thus, an ALJ is not required to explicitly discuss how he or she weighed the factors of relationship with the claimant,[7] specialization, and other factors.[8]  20 C.F.R. § 416.920c(b)(1)-(2).  Where two medical opinions reach different conclusions but are equally "well-supported . . . and consistent

---

1997)) (finding that issues adverted to in a "perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006).

[6] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions.  20 C.F.R. § 416.927(c)(2) (2020).

[7] In assessing this factor, the regulation requires an ALJ to consider the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship.  20 C.F.R. § 416.920c(c)(3).

[8] The regulations provide that an ALJ will consider any "other factors that tend to support or contradict a medical opinion."  20 C.F.R. § 416.920c(c)(5).  These factors include, but are not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim," "whether new evidence [ ] receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive," and whether the medical source has "an understanding of [the] disability program's policies and evidentiary requirements."  *Id.*

with the record," the ALJ is required to state how he or she considered the other three factors in making his or her decision.  20 C.F.R. § 416.920c(b)(3).

The ALJ summarized the findings of CE Bachara in his opinion.  (R. at 23.)  He noted that Bachara found that despite her history and diagnosis, Harris could understand, retain, and follow instructions; perform simple, repetitive tasks; had a fine attention span; and had some issues interacting with others and supervisors in a work situation.  (*Id.* at 23, 634.)  The ALJ found that Bachara's evaluation was consistent with Harris's reported daily activities and found it persuasive to the extent that it supported that Harris could perform unskilled work.  (*Id.* at 23.)  While Harris argued that the ALJ did not provide an understandable rationale for his conclusions, Harris cited no authority requiring the ALJ to do more than discuss the factors required by the regulations.  The ALJ's analysis related to the supportability and consistency of Bachara's opinion as required by the regulation.  Accordingly, the undersigned finds that the ALJ properly followed 20 C.F.R. § 416.920c in assessing the opinion of CE Bachara.

The ALJ also summarized the findings of CE Miller in his opinion.  (*Id.*)  He noted that Miller diagnosed persisting depressive disorder with intermittent major depressive features, ADHD, situational phobia related to driving, and generalized anxiety disorder among other diagnoses.  (*Id.* at 23, 704.)  He emphasized that Miller found that Harris would struggle with the stress found in a typical work day.  (*Id.* at 23, 705.)  The ALJ found Miller's evaluation to be "a bit equivocal" but ultimately "persuasive in limiting her to a range of unskilled, low stress work." (*Id.* at 23.)  While Harris criticizes the ALJ for not citing to what statements were equivocal, a review of the evaluation reveals clear examples such as "[s]he may struggle with the stress and pressure found in a typical workday" and "she may struggle with moving about and manipulating objects due to her pain."  (*Id.* at 705.)  Harris cited no authority requiring the ALJ to include as

detailed a discussion as she would seem to prefer, and based on the CE's report itself, the undersigned finds no error in the ALJ's treatment of the same.

Accordingly, the undersigned finds that Harris's arguments regarding the opinion evidence in the record do not demonstrate any failure to follow agency rules or regulations or other reversible error.

### e)    Mental Impairments

Harris argued that the ALJ improperly assessed her mental impairments and that her true medical history "shows ebb and flow of symptoms with multiple medication changes." (DN 17, at PageID # 1837.) She emphasized that the ALJ's analysis does not cite any evidence demonstrating a cure or significant vocational improvement. (*Id.*) Harris also disputed the ALJ's conclusion that her mental health improves when she adheres to her medications and avoids alcohol. (*Id.* at 1832, 1839.) She criticized the ALJ for failing to identify the date since her disability onset date that she last drank and argued that her medical records actually show persistent symptoms despite her use and compliance with medications. (*Id.* at 1833.)

The ALJ found that Harris could perform simple, routine, repetitive tasks with minimal variation in job duties day to day; she could be subject to few if any workplace changes; she should have no fast-paced production requirements; she could perform tasks over two-hour segments in an eight-hour work day; she could have occasional contact with supervisors and workers; and she could have no contact with the general public. (R. at 20.) In support, the ALJ cited to her own testimony about her mental limitations such as that she does not like being around people, she feels that people are out to get her, she has daily panic attacks, and she has difficulty sleeping. (*Id.* at 20-21.) He noted that she had been diagnosed with major depressive disorder, generalized anxiety disorder, and an unspecified depressive disorder. (*Id.* at 22.) He cited that she was admitted to

emergency room after she broke a window trying to get into her home and that at the time, she had not been taking her medications and was intoxicated. (*Id.*) He cited treatment notes where Harris reported doing well with her medications and normal mental status, ultimately finding that these treatment notes supported unskilled work with social limitations. (*Id.* at 22, 24.) The ALJ cited to the results of three mental CEs in the record, finding two of them persuasive. (*Id.* at 22-23.) The ALJ also found the opinions of the state agency physicians persuasive. (*Id.* at 24-25.) The ALJ concluded that Harris's mental health appeared to improve when she adhered to her medication regimen and avoided alcohol. (*Id.* at 24.) Harris cited to numerous medical records that she claimed disprove the ALJ's interpretation of her mental limitations. (DN 17, at PageID # 1833-34.) However, a review of the record as a whole and the particular records cited by the ALJ supports his characterization and analysis.

As to Harris's alcohol use, in May 2017, she was brought to the hospital by the police for breaking windows trying to get into her house. (R. at 996.) She was intoxicated and had not been taking her medication for her mental impairments for one to two months. (*Id.* at 674, 838, 995-96.) She initially reported alcohol use to her treatment providers in May 2017 but consistently reported no alcohol use between May 23, 2017, and March 26, 2018. (*Id.* at 668 (5/23/2017), 677 (6/20/2017), 681 (6/26/2017), 686/835 (7/17/2017), 740/831 (8/14/2017), 744 (8/21/2017), 751/823 (10/10/2017), 755/818 (10/24/2017), 841 (11/22/2017), 1156 (3/9/2018), 1148 (3/26/2018).) In March 2018, she reported drinking one to two beers but noticing that she wanted more than that, and she was encouraged to abstain from alcohol use. (*Id.* at 1147-48.) Harris then continued to consistently report no alcohol use thereafter. (*Id.* at 1142 (12/4/2018), 1132 (12/17/2018), 1128 (1/4/2019), 1124 (2/6/2019), 1115 (3/22/2019), 1110 (4/5/2019), 1104

(4/26/2019), 1100 (7/2/2019), 1095 (7/5/2019), 1084 (8/20/2019).)   An alcohol screening test in July 2019 was negative.  (*Id.* at 1088.)

   As to Harris's other mental health treatment, when she first presented for treatment at Family Health Centers in the spring and summer of 2017, she reported anxiety, depression, insomnia, and issues with her memory.  (*Id.* at 674/838 (5/24/2017), 682 (6/26/2017), 686/835 (7/17/2017), 739/830 (8/14/2017).)   She reported in July 2017 that her depression and insomnia seemed under control with medications but then reversed course in August 2017, maintaining that though her mental health medications were working well and she was taking them as prescribed, she was having trouble sleeping.  (*Id.* at 685/834 (7/17/2017), 738-39/829-30 (8/14/2017).)   Her treatment providers increased her medications.  (*Id.* at 738/829 (8/14/2017).)   She reported memory issues, anxious mood, and anxiety in October 2017, though she denied depression and said she was sleeping well.  (*Id.* at 751-52/823-24 (10/10/2017), 755/818 (10/24/2017).)   Her medications were increased again.  (*Id.* at 750/822 (10/10/2017).)   During an October 24, 2017, visit, she stated that she felt like she was doing well with her depression and anxiety and that she was being compliant with her medications.  (*Id.* at 754/817.)  In November 2017, she reported that her medications were working well, she was taking them as prescribed, and she was sleeping well. (*Id.* at 840-41.)

   When she was next seen in March 2018, Harris reported that she was anxious and had a recent breakdown after not being on her medication since January.  (*Id.* at 1155 (3/9/2018).)  She reported anxiety and depression, as well as the alcohol use discussed above.  (*Id.* at 1156 (3/9/2018), 1147-48 (3/26/2018).)  Her providers restarted her medications as is and by the end of the month she reported that she was doing well on her medications and noticed a change in her mood when she was not taking them.  (*Id.* at 1147 (3/26/2018).)  She had a large gap in her

treatment between March and December 2018.  When she was seen in December, her provider noted that Harris hadn't been seen since March and that she had not had her mental health medications filled since then.  (*Id.* at 1141 (12/4/2018).)  Harris reported anxiety, depression, and confusion about her medications.  (*Id.* at 1141-42 (12/4/2018).)  Her providers restarted her medications as is and encouraged her to stick with them regularly "to promote an even mood." (*Id.* at 1131 (12/27/2018).) She reported that she remained paranoid and was not sleeping well. (*Id.*)

In January and February 2019, Harris reported depression, anxiety, hearing voices, and having memory problems.  (*Id.* at 1127-29 (1/4/2019), 1122-23 (2/6/2019).)  Her medications were increased again.  (*Id.* at 1122 (2/6/2019).)  In early March, her providers added an additional medication for anxiety and modified her other medications a bit.  (*Id.* at 1118 (3/6/2019).)  Harris reported depression but denied psychotic symptoms and reported that she was sleeping fairly well. (*Id.* at 1118-19 (3/6/2019).)  At an April 5, 2019, evaluation, she reported no psychological symptoms.  (*Id.* at 1111 (4/5/2019).)  In late April, she reported her medications were working well and was directed to continue her medications as is; however, she reported some anxiety as well given her physical health issues and that she was not sleeping well.  (*Id.* at 1103 (4/26/2019).) In July 2019, her provider increased her anxiety medication again due to struggles with anxiety while driving through Harris otherwise reported that she felt good.  (*Id.* at 1098-99 (7/2/2019).) At her last documented visit in August 2019, her provider described her as "clinically stable" and directed her to continue her medications as is.  (*Id.* at 1082.)  Harris reported that her medications were working well and that she liked the medications she was taking.  (*Id.* at 1083.)

While the undersigned agrees with Harris that the medical records show an ebb and flow of symptoms and medication changes, those changes were credited by the ALJ and he did not

misrepresent Harris as having been cured.  Instead, he simply relied on the evidence cited above that she reported doing well when compliant with her medications.  As to his conclusions regarding her alcohol use, though the record contains fewer references to alcohol use than to her sobriety, the few references to it demonstrated that it interfered with her mood and mental state, supporting the ALJ's conclusion that abstention improved her symptoms.  Harris also argued that the persistence of her symptoms prevented her from doing work under the limitations provided by the ALJ, but she pointed to no evidence in the record that any treatment provider ever prescribed work related limitations due to her conditions.  Instead, the ALJ relied upon the opinion evidence in the record to support his conclusions regarding her abilities despite the persistence of certain of her symptoms.  CE Bachara found that she could perform simple repetitive tasks and had issues interacting with coworkers, especially people in authority.  (*Id.* at 23, 634.)  CE Miller found that she would have difficulty staying on task and responding to the stress of a typical workday.  (*Id.* at 24, 704.)  The state agency physicians on initial review found that Harris could understand and perform simple and detailed instructions and sustain attention in two-hour periods for simple tasks.  (*Id.* at 24, 128.)  On reconsideration, the state agency physicians found that she could interact with the public, coworkers, and supervisors occasionally.  (*Id.* at 24, 144-45.)  The ALJ relied upon these opinions but included further restrictions based on the medical records, including that Harris should not interact with the public, have minimal variation in job duties day to day, be subject to few work place changes, and have no fast-paced production requirements.  (*Id.* at 20.)  Based on his assessment of the medical, opinion, and other evidence in the record, the undersigned finds that the ALJ's analysis of Harris's mental impairments was supported by substantial evidence.

While Harris cited to numerous pieces of evidence in the record she claimed supported her interpretation of her limitations, given the undersigned's conclusion that substantial evidence

supports the ALJ's decision, the undersigned may not engage in such an inquiry. *See Gayheart*, 710 F.3d at 374 (holding that "[t]he Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion.").

### f)      Combination of Impairments

Harris also argued that the ALJ failed to consider whether the combination of her impairments made her disabled. (DN 17, at PageID # 1830, 1834-36, 1839.) However, in his step three finding regarding the listings, the ALJ specifically noted that Harris did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (R. at 17.) The ALJ is required to consider the combined effect of a claimant's impairments in determining whether the claimant is disabled. 20 C.F.R. § 416.923 (2020). Discussing multiple impairments individually does not mean the ALJ failed to consider the combined effect of those impairments where the ALJ specifically referred to a "combination of impairments" in finding that the claimant did not meet the Listings. *Gooch v. Sec'y of Health & Hum. Servs.*, 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988); *Loy v. Sec'y of Health & Hum. Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990). Accordingly, the undersigned finds Harris's argument to be without merit.

### g)      Pain

Harris also argued that the ALJ erred in failing to include a narrative discussion of the factors set forth in 20 C.F.R. § 416.929(c)(3)(i)-(vii). (DN 17, at PageID # 1831.) Those factors relate to an ALJ's consideration of a claimant's pain symptoms and how that pain and those symptoms limit a claimant's capacity for work. 20 C.F.R. § 416.929(c)(1). The regulations cited by Harris require the ALJ to consider a number of factors as part of his analysis including a

claimant's daily activities, effectiveness of any medication taken to relieve symptoms, and any side effects of that medication. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)) ("Relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions."). However, Harris cited no authority to support that the ALJ must individually discuss each factor. Instead, he is simply required to consider them. The discussion of the ALJ's treatment of Harris's physical and mental impairments above demonstrates that the ALJ did consider many of the factors even if he did not include a citation to the particular factor afterward. Accordingly, the undersigned finds Harris's argument to be without merit.

### h)    Substantial Evidence Generally

To the extent that anything in Harris's brief could be construed as a general challenge to the existence of substantial evidence to support the ALJ's RFC finding, the undersigned finds that the ALJ's RFC finding is supported by substantial evidence for the reasons set forth above. The ALJ cited to medical evidence of record, including the records regarding her use of a cane, cubital tunnel syndrome, syncope, and mental impairments discussed above, as well as Harris's own testimony in support of his conclusion. Further, he properly relied on the opinion evidence in the record when he deemed the same to be persuasive pursuant to the operative regulations. Where the ALJ relies on substantial evidence to support his conclusions, the role of the Court is not to second-guess those conclusions. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir.

2012) (noting that "[a]s long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess," and reversal is not "warranted even if substantial evidence would support the opposite conclusion").

### 2. Step Five

Harris argued that the ALJ's step five determination was not supported by substantial evidence. (DN 17, at PageID # 1838-39.) At step five, the ALJ has the burden of demonstrating that there exists a significant number of jobs in the national economy that the claimant can perform given his or her RFC, age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v), (g); 20 C.F.R. § 416.960(c) (2020); *Jordan*, 548 F.3d at 423. The Commissioner may meet this burden by relying on expert vocational testimony received during the hearing to determine what jobs exist in significant numbers in the economy that the claimant can perform considering the combination of his or her limitations. *See, e.g.*, *Fry v. Comm'r of Soc. Sec.*, 476 F. App'x 73, 76 (6th Cir. 2012); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

Harris argued that the jobs the ALJ determined that she was capable of performing based on the testimony of the vocational expert ("VE") were inconsistent with his determination of her RFC. (DN 17, at PageID # 1838-39.) The ALJ posed a hypothetical to the VE that mirrored his finding of Harris's RFC, and the VE testified that a limited range of work would be available for such an individual, including garment folders (Dictionary of Occupational Titles ("DOT") # 369.687-018), garment sorters (DOT # 361.687-014), and bakery workers (DOT # 524.687-022). (R. at 96-97.) The VE testified that there were 49,000 garment folder positions, 44,000 garment sorter positions, and 51,000 bakery worker positions available nationally. (*Id.* at 97.) In response to a question from the ALJ, the VE then confirmed that her testimony had been consistent with the DOT except for her testimony regarding a separate hypothetical posed by the ALJ, which included

a limitation regarding a need to be off task during the workday that did not end up in the ALJ's ultimate finding of Harris's RFC; accordingly, her testimony on that issue was based on her experience.  (*Id.* at 98.)  Harris's attorney did not pose any questions to the VE related to the consistency of those occupations with the ALJ's hypothetical/RFC.  (*Id.* at 96-100.)  Based on the VE's testimony, the ALJ concluded that there was other work available in the significant numbers in the national economy that the claimant was capable of performing.  (*Id.* at 25-26.)

Harris argued in her Fact and Law Summary for the first time that she could not work as a garment folder or bakery worker because the ALJ's RFC eliminated fast-paced production work and those two jobs involved work with conveyor belts.  (DN 17, at PageID # 1838.)  She also noted that the ALJ's RFC eliminated exposure to hazards and that a "conveyor is moving machinery." (*Id.*)  The DOT listing for a garment sorter does not mention a conveyor belt and instead states, "Moving Mech. Parts: Not Present - Activity or condition does not exist."  U.S. Dep't of Labor, *Dictionary of Occupational Titles,* § 369.687.018 (rev. 4th ed. 1991) (1991 WL 673072). However, the occupation title corresponding to the position the VE referred to as "bakery worker" is listed in the DOT as "bakery worker, conveyor line" and contains numerous references to work on a conveyor line.  *Id.* at § 524.687-022 (1991 WL 674401).  As part of the job description and requirements, it also states, "Moving Mech. Parts: Occasionally - Exists up to 1/3 of the time."  *Id.* However, despite reference to a conveyor line in the former, neither the DOT entries for garment sorter nor bakery worker specifically reference a fast pace or production work.  *Id.* at § 369.687.018 (1991 WL 673072); *id.* at § 524.687-022 (1991 WL 674401).  Harris also provided no authority to support that a conveyor is the type of dangerous machinery the ALJ was referencing by limiting her exposure to hazards.  Accordingly, it is unclear to the undersigned that Harris has demonstrated any conflict between the ALJ's RFC and the job descriptions in the DOT.

Nonetheless, even if there were a conflict, the undersigned finds that Harris has failed to demonstrate that the same constitutes reversible error.  At the hearing, in accordance with his duty under SSR 00-4p, the ALJ asked the VE whether her testimony was consistent with the DOT, the VE said it was, and Harris did not raise any potential conflicts.[9]  (R. at 96-100.)  "Nothing in SSR 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."  *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006).  Thus, an "ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00–4p.  This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief."  *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168-69 (6th Cir. 2009) (citations omitted); s*ee also Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).  This lack of cross examination by Harris's counsel is particularly significant given that neither the ALJ nor the VE are bound by the DOT's classifications.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003).  "Neither the DOT nor the VE['s] . . . evidence automatically 'trumps' when there is a conflict" between the two;  instead, the ALJ "must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE['s] . . . testimony rather than on the DOT information."  SSR 00-4p, 65 Fed. Reg. at 75,760.  Without an objection on this basis, the ALJ had no reason to inquire further into the VE's testimony.  Thus, because the ALJ asked the VE if her testimony was consistent with the DOT and the uncontradicted testimony of the VE indicated that no conflict existed, it was not error for the ALJ to rely on her testimony.

---

[9] Where the ALJ relies on the testimony of a VE, SSR 00-4p imposes on the ALJ an affirmative duty to ask the VE whether there is a conflict between the VE's testimony and information in the DOT.  SSR 00-4p, 65 Fed. Reg. 75,759, 75,760 (Dec. 4, 2000).  If there appears to be a conflict, ALJ must elicit from the VE an explanation for the conflict. *Id.*

Additionally, even if the undersigned were to conclude that a garment folder or bakery worker were not appropriate jobs for Harris given her RFC, the evidence still supports that she could work as a garment sorter (DOT # 361.687-014), which the VE testified had 44,000 available positions nationally.  (R. at 26, 97.)  This constitutes sufficient evidence to support the ALJ's step five finding that there exists a significant number of jobs in the national economy that Harris could perform given her RFC, age, education, and past work experience.  *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (finding that fewer than 1000 regional jobs can be a significant number of jobs to determine whether a claimant is disabled); *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (finding that 6,000 "jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (holding that 2,000 jobs was a significant number).

Harris also argued that she could not do the jobs cited by the ALJ because of her cubital tunnel syndrome and syncope.  (DN 17, at PageID # 1838-39.)  A VE's testimony can constitute substantial evidence to support the Commissioner's finding that a claimant is capable of performing a significant number of jobs existing in the economy, *Bradford v. Sec'y Dep't. of Health & Hum. Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (per curiam), only so long as the VE's testimony is based on a hypothetical question that "accurately portrays [a claimant's] individual physical and mental impairments."  *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).  *See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).  "However, the ALJ is only required to incorporate into the hypothetical questions those limitations which have been accepted as credible."  *Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776 (6th Cir. 2002); *see also Stanley v.*

*Sec'y of Health & Hum. Servs.,* 39 F.3d 115, 118-19 (6th Cir. 1994) ("[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals.")).  The undersigned has already found above the that ALJ's determination of Harris's RFC, including his treatment of her cubital tunnel syndrome and syncope is supported by substantial evidence.  Thus, the ALJ was not required to include additional limitations related to these impairments in his hypothetical to the VE, and the VE's testimony constitutes substantial evidence to support his step five determination.

Accordingly, the undersigned finds that Harris has failed to demonstrate any reversible error in the ALJ's step five analysis.

## III.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

Colin H Lindsay, Magistrate Judge

United States District Court

cc:    Counsel of Record

August 17, 2021

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all Parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).